FILED
9/27/19 11:43 am
CLERK
U.S. BANKRUPTCY
COURT - WDPA

## EXHIBIT A TO ORDER (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS

## ASSET PURCHASE AGREEMENT

By and between

William G. Krieger, solely in his capacity as Chapter 11 Trustee of the Bankruptcy Estate of
Lawson Nursing Home, Inc.


And


Jefferson Hills Holdings, LLC


Dated as of: August 1, 2019

## ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT** (this "Agreement") is made as of the 1st day of August, 2019 (the "*Effective Date*"), by and between the William G. Krieger, solely in his capacity as Chapter 11 Trustee ("Trustee") of the Bankruptcy Estate of Lawson Nursing Home, Inc. ("Debtor"), and Jefferson Hills Holdings, LLC, a Delaware limited liability company ("Purchaser").

WHEREAS, Lawson Nursing Home, Inc. filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Western District of Pennsylvania (the "Bankruptcy Court") at Bankruptcy No. 18-23979-GLT (the "Bankruptcy Case") on October 10, 2018 (the "Petition Date") under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101, et seq (the "Bankruptcy Code");

WHEREAS, Trustee was appointed as the Chapter 11 Trustee of the Debtor in the Bankruptcy Case on or about June 26, 2019 at Doc. 266 in the Bankruptcy Case;

WHEREAS, Debtor is the owner and operator of real property, improvements and personal property used in connection with its operation of a licensed, skilled-care nursing facility (the "Facility");

WHEREAS, Trustee desires to sell, and Purchaser desires to purchase, the Facility and the Purchased Assets (as defined below), through the use of sale procedures under 11 U.S.C. §363; and

WHEREAS, Trustee and Purchaser desire to enter into this Agreement in order for Purchaser to serve as a "stalking horse bidder".

NOW THEREFORE, in consideration of the mutual covenants and provisions herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby covenant and agree as follows:

1. **Sale and Purchase of Purchased Assets; Assumption of Liabilities; Excluded Assets**.

   a. Purchased Assets. Subject to the provisions set forth herein, Trustee agrees to sell, convey, assign, deliver and transfer, free and clear of all claims, liens, deeds of trust, mortgages, easements, restrictions, encumbrances or security interests of any nature whatsoever (collectively, "Exceptions") except for Permitted Exceptions (as herein defined), and Purchaser hereby agrees to purchase, acquire, accept and assume, upon the terms and conditions hereinafter set forth, all of Debtor's right, title and interest in and to all assets of Debtor other than the Excluded Assets (as herein defined), including but not limited to all of the tangible and intangible assets which comprise or are used or are held for use in connection with or are necessary to the operation of the business at the Facility, described as follows (the "Purchased Assets"):

i.      the real property consisting of those certain plots, pieces or parcels of land located in Jefferson Hills, Pennsylvania, as more particularly described in **Exhibit A** hereto (the "Land");

ii.      the Facility consisting of all buildings and all other structures, facilities or improvements presently or hereafter located in or on the Land (the "Improvements"), including without limitation, the buildings, structures and improvements utilized in the operation of that certain skilled bed nursing facility commonly known as "Lawson Nursing Home" and located at 540 Coal Valley Road, #2, Jefferson Hills, PA 15025;

iii.      all furnishings, machinery, equipment, computer and software utilized in the operation of the Facility, and usable inventory, including without limitation all usable medical supplies, office supplies, maintenance supplies, food inventory, linen and other supplies (collectively, the "Personal Property" and collectively with the Land, the Improvements and the Facility, (the "Property");

iv.      any intangible property of Debtor, including, without limitation, the name "Lawson Nursing Home", trademarks, service marks, telephone and facsimile numbers, domain names, websites, social media accounts and goodwill associated with such names;

v.      the Warranties (as herein defined),

vi.      the Permits (as herein defined);

vii.      subject to HIPAA and other privacy regulations, all patient (including all care plans and medical and billing records for current residents), medical staff, personnel records pertaining to current employees, and other operating records of the Facility and the Land (including equipment records, medical/administrative libraries, medical records, documents, catalogs, books, records, files and operating manuals),

viii.      all agreements with current residents of the Facility regarding admission and residency; and

ix.      and any other assets of Debtor located at or used in connection with the Facility, including, without limitation, policy and procedure manuals, other than the Excluded Assets.

b.      Excluded Liabilities; No Assumption of Liabilities.  Except as specifically set forth herein or in the Other Documents (as herein defined) to the contrary, Purchaser shall not assume and shall not be liable, for any debts, liabilities or obligations of any kind or nature, at any time existing or asserted, whether or not accrued, whether fixed, contingent or otherwise, whether known or unknown, arising out of this or any other transaction or event, including, but not limited to the following (each an "Excluded Liability" and collectively the "Excluded Liabilities"):

i.      liabilities or obligations of Debtor to any of its creditors, shareholders or owners;

ii.        liabilities or obligations, including trade liabilities, of Debtor with respect to any acts, events or transactions occurring prior to, on or after the Closing Date;

iii.        liabilities or obligations arising or relating to the ownership or operations of the Facility prior to the Closing Date;

iv.        all liabilities or obligations of Debtor for taxes or fees in respect of periods ending on or prior to the Closing Date or resulting from the consummation of the transactions contemplated herein;

v.        liabilities or obligations associated with any Excluded Assets;

vi.        liabilities or obligations associated with any and all indebtedness of Debtor for borrowed money, including but not limited to liabilities related to Debtor's debtor-in-possession use of cash collateral financing from Huntington Bank;

vii.        liabilities or obligations arising from any Assumed Contract (as defined herein) before the Closing Date or resulting from any breach or default prior to the Closing Date of any Assumed Contracts or other Assumed Liabilities (as defined herein) and liabilities arising under any Contracts that is not an Assumed Contract;

viii.        liabilities or obligations arising out of or in connection with claims, litigation or proceedings described in Debtor's Official Form 206D, and claims, litigation and proceedings (whether instituted prior to or after the Closing) for acts or omissions which allegedly occurred prior to the Closing Date;

ix.        liabilities or obligations arising from Debtor's participation in Medicare / Medicaid or governmental insurance programs, restricted grant or loan programs of any grant provider or Governmental Authority.    For purposes of this Agreement, "Governmental Authority" or "Governmental Authorities" shall include any and all federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority, or any arbitrator, court, (including the Bankruptcy Court), tribunal of competent jurisdiction or other entity or officer exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government, including, but not limited to, the Centers for Medicare and Medicaid Services, the Pennsylvania Department of Health, and the Pennsylvania Department of Human Services.

x.        liabilities or obligations to Debtor's 401K Plan, any employees, any employee benefit plans, the Internal Revenue Service, the Pension Benefit Guaranty Corporation or any other Governmental Authority, arising from or relating to periods prior to the Closing (whether or not triggered by the transactions contemplated by this Agreement), including liabilities or obligations arising under any employee benefit plan, severance pay program or arrangement, accrued vacation pay and benefits to Debtor's

employees, accrued sick pay and benefits to Debtor's employees, Equal Employment Opportunity Commission claim, unfair labor practice, and wage and hour practice;

xi.      Cost Report settlement payables relating to all open Cost Report periods ending on or before the Closing Date (for purposes of this Agreement, "Cost Reports" included all cost and other reports filed pursuant to the requirements of the government reimbursement programs of any Governmental Authorities for payment or reimbursement of amounts due from them);

xii.      penalties, fines, settlements, interest, costs and expenses arising out of or incurred as a result of any actual or alleged violation by Debtor of any legal requirement, including, without limitation, those cited by any Governmental Authority relating to violations resulting from a condition or incident at the Facility that occurred or existed prior to Closing, regardless whether cited prior to, on or after the Closing;

xiii.      liabilities or obligations arising under the WARN Act, if any, arising out of or resulting from layoffs of employees by Debtor prior to the Closing and/or the consummation of the transactions described in this Agreement;

xiv.      liabilities or obligations of Debtor for any federal, state, commonwealth, county or local taxes applicable to or assessed against Debtor or the assets or business of Debtor; and

xv.      any contingent liabilities or obligations of Debtor, whether known or unknown by Debtor and/or Purchaser; and

c.      Excluded Assets. Debtor shall retain the following assets (the "Excluded Assets"), which shall be exclude from the definition of the Purchased Assets under this Agreement:

i.      Debtor's rights arising under this Agreement or under any other agreement between Purchaser and Debtor;

ii.      all cash, cash equivalents, accounts receivable or short-term investments as of the Closing Date;

iii.      all motor vehicles titled in Debtor's name;

iv.      all rights to refunds from whatever source including, without limitation, for taxes, fees, assessments and charges, those arising out of retrospective premium adjustments under insurance policies covering the Facility or the operations thereof, or any settlement refunds related to open Cost Reports for periods ending prior to the Closing Date;

v.      all casualty, general liability and other insurance policies which cover Debtor, the Facility or the operations thereof, but not insurance proceeds attributable to post-Closing Date losses related to the Purchased Assets;

     vi.        corporate organizational documents, minute books, tax records and seals;

     vii.       those rights relating to deposits and prepaid expenses and claims for refunds and rights to offset in respect thereof to the extent listed in **Schedule 1(c);**

     viii.      any and all tangible and intangible property, including software, which is leased or licensed to Debtor by a third-party;

     ix.        Debtor's policies of directors' and officers' liability insurance and all premiums, rights. and claims thereunder and/or thereto;

     x.         All contracts and agreements that are not Assumed Contracts; and

     xi.        All claims and causes of action against third parties whether in tort and/or contract in equity or at law, including but not limited to, all claims and causes of action against current and former officers and directors or other insiders of the Debtor.

     xii.       All preference, fraudulent conveyance and other claims of Debtor or the Debtor's estate arising under Chapter 5 of the United States Bankruptcy Code 11 U.S.C. Section 101, *et seq*.

d.      <u>Assumed Contracts and Rejected Contracts.</u> A list of all of Debtor's executory contracts and leases are attached as **Schedule 1(d)**.

     i.        <u>Assumed Contracts.</u> Subject to Bankruptcy Court approval, prior to the date of the Auction (as defined herein), Purchaser shall submit as **Schedule 1(d)(i)** a schedule of Contracts to be assumed by Debtor and Assigned to Purchaser under Section 365 of the Bankruptcy Code (the "<u>Assumed Contracts</u>") on the Closing Date. With respect to the Assumed Contracts, Purchaser shall, pursuant to Section 365 of the Bankruptcy Code, cure any past defaults in order for Trustee to assume and assign to Purchaser (or Purchaser's designee) the Assumed Contracts. Purchaser shall assume all rights and obligations of Debtor arising on or after the Closing Date under the Assumed Contracts. Any Assumed Contracts designated by Purchaser shall be assigned to and assumed by Purchaser at the Closing. Subject to the right of Trustee (immediately below) to reject any Contract, the final determination of which Contracts Trustee will assume and assign to Purchaser shall be within the sole discretion of Purchaser, subject to Bankruptcy Court approval.

     ii.       <u>Rejected Contracts.</u> Contracts that are not the Assumed Contracts may be rejected by Trustee ("<u>Rejected Contracts</u>"), provided, however, that the Contracts listed on **Schedule 1(d)** shall not be rejected by Trustee prior to the Closing without the written consent of Purchaser, which consent shall not be unreasonably withheld.

2.      **Purchase Price; Closing Procedure**.

a.      <u>Purchase Price</u>. Unless modified through the Auction (described below), the purchase price for the Purchased Assets shall be equal to One Million Eight Hundred Thousand

Dollars ($1,800,000). The Purchase Price shall be allocated as set forth in **Exhibit B** attached hereto.  Each party agrees (i) to complete jointly and file separately Form 8594 with its federal income tax return consistent with such allocation for the tax year in which the Closing occurs, and (ii) that no party shall take a position on any income, transfer, gains or other tax return, or before any federal, commonwealth, state or local governmental or quasi-governmental authority or in any judicial proceeding that is in any manner inconsistent with the terms of any such allocation.

b.      Payment of Purchase Price.  Payment of the Purchase Price shall be made as follows:

i.      An earnest money deposit (the "Deposit") in an amount equal to One Hundred Thousand Dollars ($100,000) shall be delivered by Purchaser to Riverside Abstract (the "Title Company"), as escrow agent, within three (3) business days of the Effective Date.  The Deposit shall be held in escrow in a non-interest-bearing account. The provisions of this Section will be incorporated into the Bidding Procedures Order, and such Bidding Procedures Order shall provide that the Deposit shall not be deemed to constitute property of Debtor, and Trustee shall have no interest of any kind (equitable or otherwise) in the Deposit unless and until such deposit is actually paid or payable to Trustee in accordance with this Agreement.  If the Closing occurs, then the Deposit shall be paid to Trustee in accordance herein.  Deposit shall only become nonrefundable and become property of Debtor if Purchaser fails to satisfy its obligations under this Agreement.  The Title Company shall return the Deposit to Purchaser if any of the following events occur: (A) the Bidding Procedures Order is not approved by the Bankruptcy Court on or before [*], 2019 and Purchaser terminates this Agreement in writing on account thereof, (B) Purchaser is not the successful bidder or back-up bidder at the Auction, (C) Purchaser is the successful bidder at the Auction, but the Bankruptcy Court does not approve the sale of the Purchased Assets to Purchaser; or (D) Purchaser terminates this Agreement in accordance with the Due Diligence provisions; and

ii.      At the Closing, an amount equal to the Purchase Price less the Deposit shall be paid by Purchaser to Trustee.

c.      Auction.  In accordance with the Bidding Procedures Order, Trustee will sell the Purchased Assets at a public auction (the "Auction") utilizing the sale procedures specifically set forth in such Bidding Procedures Order.

d.      Bidding Procedures.  Pursuant to the Bankruptcy Court order approving the contemplated transaction (the "Bidding Procedures Order") and the procedures for bidding at the Auction (the "Bidding Procedures"), incremental bidding will be at $100,000 for any overbid and then in increments of $25,000 thereafter.

e.      Other Bids.  Purchaser acknowledges that, pursuant to the Bidding Procedures Order, Trustee will solicit bids from one or more other prospective qualified purchasers for the sale of some or all the Purchased Assets in accordance with the procedures set forth in the Bidding Procedures Order.

   f. <u>Break Up Fee</u>. Pursuant to the Bid Procedures Order, if Trustee sells all or substantially all of the Purchased Assets described herein to another bidder unrelated to Purchaser and, subject to HIPAA and other privacy regulations, Purchaser has shared all the information acquired from Debtor or Trustee for due diligence with Trustee for placement into an electronic virtual room or electronic data room established by Trustee, then at the Sale Hearing to approve the transaction to a successful bidder (other than the Purchaser), the Chapter 11 Trustee shall seek approval from the Bankruptcy Court a breakup fee in an amount not to exceed $50,000.00 (the "<u>Breakup Fee</u>") for the actual out-of-pocket costs and expenses incurred by the Purchaser as a result of serving as the Stalking Horse Bidder. The Break-Up fee shall only become due and payable at closing of such sale to another bidder, and shall survive the termination of this Agreement.

   g. <u>Waiver of Challenge Rights</u>. If, for any reason, Purchaser is not the successful bidder at the Auction and/or does not ultimately acquire the Purchased Assets at Closing, Purchaser agrees that, in consideration for the Break-Up Fee and other consideration provided hereunder, Purchaser shall not challenge, attempt to prevent, hinder, delay or frustrate Trustee's transfer of any or all of the Purchased Assets to another transferee, and Purchaser hereby irrevocably waives any all rights to bring such a challenge. Purchaser acknowledges that Debtor, Trustee and the Purchased Assets will be irreparably harmed by Purchaser's failure to comply with this provision of the Agreement and agrees that Trustee and/or Debtor shall be entitled to equitable relief against Purchaser in the form of an injunction, specific performance, or otherwise.

   h. <u>The Sale Approval Order</u>. Trustee shall obtain from the Bankruptcy Court a sale approval order (the "<u>Sale Approval Order</u>") which, among other things, (i) determines that this Agreement was proposed by Purchaser in good faith without collusion and represents the highest and best offer for the Purchased Assets and should be approved; (ii) determines that this Agreement is the Successful Bid (as defined in the Bid Procedures Order); (iii) determines that Purchaser is a good faith Buyer under Section 363(m) of the Bankruptcy Code and that the provisions of Section 363(n) of the Bankruptcy Code have not been violated; (iv) authorizes and directs Debtor/Trustee to sell the Purchased Assets to Purchaser pursuant to this Agreement and Section 363 of the Bankruptcy Code, free and clear of all of the Excluded Liabilities and of all liens, claims, encumbrances, liabilities, interests (including any and all "interests" in the Purchased Assets within the meaning of Section 363(f) of the Bankruptcy Code), causes of action, demands, guaranties, rights, restrictions, remedies, and matters of any kind or nature whatsoever, whether at law or in equity, including, without limitation, free and clear of any rights or claims based on theories of transferee or successor liability under applicable law, statute, rule, regulation, common law or equitable principle, including, without limitation, any environmental laws, labor or employment laws (including, but not limited to, unemployment compensation, workers' compensation, wage and hour, discrimination, wrongful discharge, unfair labor practices, etc.), ERISA (including, but not limited to, termination liability or withdrawal liability from any defined benefit pension plan), COBRA, and the Code, of any Governmental Authority, including, without limitation, the Pension Benefit Guaranty Corporation, the IRS, state and local taxing authorities and any Governmental Authority, whether arising before or after the commencement of the Bankruptcy Case and whether imposed by agreement, understanding, law, equity, regulation, custom or otherwise, including, without limitation, Debtor's 401K or other benefit plans, save and excepting only the Assumed Liabilities expressly assumed by Purchaser in writing pursuant to this

Agreement; (v) authorizes and directs Debtor/Trustee, pursuant to Section 365 of the Bankruptcy Code, to assume and to assign to Purchaser the Assumed Contracts and to make all cure payments related thereto and determines that Purchaser has provided adequate assurance of future performance relative to the Assumed Contracts and provides the Assumed Contracts shall be assigned to Purchaser; (vi) authorizes and directs Debtor/Trustee to execute, deliver, perform under, consummate and implement, this Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the foregoing; (vii) permanently enjoins each and every holder of an Excluded Liability from commencing, continuing or otherwise pursuing or enforcing any remedy, claim or cause of action against Purchaser relative to such Excluded Liability; and (vii) provides the Bankruptcy Court shall retain jurisdiction over enforcement of this Agreement any claims that are not Assumed Liabilities hereunder.

i.        **Bankruptcy Filings.** From and after the date of this Agreement and until the Closing Date, Trustee shall deliver to Purchaser drafts of any and all material pleadings, motions, notices, statements, schedules, applications, reports and other papers to be filed or submitted in connection with this Agreement for Purchaser's prior review at least two (2) business days prior to the filing or submission thereof (to the extent reasonably practicable, and otherwise, as far in advance of such filing or submission as reasonably practicable). Trustee agrees to diligently prosecute the entry of the Bid Procedures Order and the Sale Approval Order. In the event the entry of the Bid Procedures Order or the Sale Approval Order shall be appealed, Trustee shall use his best efforts to defend such appeal. Trustee shall comply with all notice requirements (i) of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, or (ii) imposed by the Sale Approval Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith.

j.        **Appeal.** In the event an appeal is taken, or a stay pending appeal is requested, from the Sale Approval Order, Trustee shall immediately notify Purchaser of such appeal or stay request and shall provide to Purchaser within one business day a copy of the related notice of appeal or order of stay. Trustee shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from either of such orders.

3.        **Time and Placing of Closing**. The closing of the transactions contemplated hereby (the "Closing") shall take place through the office of the Title Company, subject to the satisfaction of the closing conditions set forth herein, thirty (30) days immediately following the approval and entry of the Sale Approval Order, or such other date as mutually agreed upon in writing by Purchaser and Trustee (the "Closing Date").

4.        **Due Diligence; Title and Survey; Title Defects**.

a.        Due Diligence Period; Site Inspection.  Purchaser shall have until the date of the Auction, (the "Due Diligence Period"), to complete its due diligence review of the Purchased Assets. Purchaser (and its agents and lender) shall have the right, at reasonable times and on reasonable prior notice to Trustee, to enter upon the Property to conduct such inspections, investigations, tests and studies as Purchaser shall deem necessary, including, without limitation, environmental site assessments, engineering tests and studies, physical examinations of the Property, due diligence investigations and feasibility studies. Prior to the Purchaser or any third-party site inspectors, engineers or other parties entering the Property, Purchaser shall deliver to

Trustee a Certificate of Insurance evidencing general liability coverage in an amount not less than $2,000,000, naming the Trustee and Debtor as an additional insured. The costs and expenses of such inspections, tests and studies shall be borne solely by Purchaser. During the Due Diligence Period, and if successful bidder, up to the Closing Date, Purchaser shall also have the right to tour the Property, to review the books and records related to the financial condition and the operations of the Facility and to observe the day-to-day operations and management thereof. Purchaser shall defend, indemnify and hold harmless Trustee and Debtor from and against any liabilities, claims, demands, actions, loss or damage for personal injury or property damage claimed by third parties incident to, resulting from or in any way arising out of any negligence or wrongful act of Purchaser, its agents, employees and/or contractors, in connection with entry upon or inspection by or on behalf of Purchaser of the Purchased Assets and, notwithstanding anything to the contrary in this Agreement, such obligation to indemnify shall survive the Closing or any termination of this Agreement. Purchaser may terminate this Agreement for any or no reason by providing written notice to Trustee on or prior to the end of the Due Diligence period and this Agreement shall be null and void and the Title Company shall refund the Deposit to Purchaser. If Purchaser fails to give such notice to Trustee, it shall be conclusively presumed that Purchaser is satisfied with its due diligence review and this contingency shall be deemed satisfied, this Agreement shall continue in full force and effect. Any information acquired by Purchaser from Trustee or Debtor in performing the due diligence will be shared in an electronic virtual room or electronic data room established by Trustee; provided however, this shall not apply to information subject to privacy laws including HIPAA.

b.     Due Diligence Materials. Trustee shall deliver or cause to be delivered to Purchaser copies of all the Due Diligence Materials. "Due Diligence Materials" shall mean the items listed on **Exhibit C** and any other information or documents concerning Debtor's affairs in Trustee's possession, as Purchaser reasonably may request.

c.     Title and Survey.

i.     To the extent available, Trustee shall provide Purchaser with a copy of its most current title insurance policy for the Property (the "Existing Title Policy"). Within ten (10) days following the Effective Date, Purchaser shall order from the Title Company a commitment (the "Title Commitment") for an ALTA owner's title insurance policy in an amount equal to the Purchase Price (the "Title Policy"), dated or updated to the Closing Date, insuring or committing to insure, at its ordinary premium rates, Purchaser's good and marketable title in fee simple to the Property. Purchaser may, at its sole cost and expense, obtain a survey of the Property (the "Survey").

ii.     Trustee agrees to convey the Property, and Purchaser agrees to purchase the same, free and clear of all liens and encumbrances other than the Permitted Exceptions (hereinafter defined). As used in this Agreement, the term "Permitted Exceptions" shall mean all title matters accepted or deemed accepted by Purchaser hereunder.

d.     Title Defects. Prior to the expiration of the Due Diligence Period, Purchaser shall notify Trustee of any defect matters ("Title Defects") shown on the Title Commitment or the Survey to which Purchaser objects ("Purchaser's Title Objection Notice"). Within ten (10)

business days of the receipt of Purchaser's Title Objection Notice, Trustee may elect in his sole discretion, by written notice to Purchaser, to either (i) undertake at Debtor's expense to cure such Title Defects prior to the Closing ("Debtor's Election"), or (ii) not cure such Title Defects. In the event that Trustee does not elect to cure such Title Defects pursuant to the immediately preceding sentence, Purchaser may, by written notice to Trustee within ten (10) business days of Debtor's Election (x) terminate this Agreement, in which event Purchaser shall receive a refund of the Deposit, all parties shall be relieved of any further obligations or liabilities hereunder, or (y) indicate to Trustee that, notwithstanding the Title Defects described in this Section 4(d), Purchaser shall not terminate this Agreement as a result of such Title Defects (such Title Defects, as well as any matters shown in the Title Commitment or Survey to which Purchaser does not object as permitted herein, being thereafter deemed as Permitted Exceptions hereunder); provided, however, that Purchaser's failure to notify Trustee of its intentions pursuant to this sentence shall be deemed Purchaser's intention to proceed under subsection (y) hereof. Notwithstanding the foregoing, Purchaser shall not be required to object to, and Debtor shall be required to pay off at the Closing, any and all title exceptions or encumbrances that may be cleared through the payment of an ascertainable amount of money resulting from matters to which Debtor is a party, including without limitation, any financing obtained or assumed by Debtor and secured by a mortgage covering the Property, any mechanic's or materialmen's liens resulting from work engaged by Debtor, any tax or judgment lien against Debtor; provided, however, Purchaser Acknowledges that the Trustee and Debtor will only have available to them the Purchase Price proceeds and Debtor and Trustee shall be entitled to utilize the Purchase Price proceeds to effectuate any or all of the foregoing.

e.     Trustee may provide the information required under this Section 4 to Purchaser by delivering the information to Purchaser or by posting the same in the electronic virtual room or electronic data room established by Trustee and providing notice thereof and access thereto to Purchaser.

5.     **Conditions to Closing**.

a.     Purchaser's Conditions. Purchaser's obligation to consummate the transactions contemplated in this Agreement shall be subject to the following conditions precedent on and as of the Closing Date or the waiver thereof by Purchaser, which waiver shall be binding upon Purchaser only to the extent made in writing on or prior to the Closing Date.

i.     Purchaser has obtained the necessary license(s) from Governmental Authorities to operate a skilled nursing facility on the Property. Purchaser shall exercise reasonable and good faith efforts to obtain said license(s);

ii.     Possession of the Property shall be delivered to Purchaser free and clear of all tenancies and other occupancies (other than any occupancy rights of any residents of the Facility and as may be listed on Schedule 8(f)) and the Purchased Assets shall be delivered to Purchaser free and clear of Exceptions except for Permitted Exceptions.

iii.     Trustee shall deliver to Purchaser or, if applicable, to the Title Company to be held in escrow in accordance with the terms of this Agreement, on or before the Closing Date the following:

1.     a Special Warranty Deed for the Property, in substantially the form annexed hereto as **Exhibit D** (the "Deed");

2.     a bill of sale for the Personal Property, in substantially the form annexed hereto as **Exhibit E** (the "Bill of Sale");

3.     an affidavit of title and such other affidavits as may be required by the Title Company in connection with the conveyance of the Property in form and substance reasonably satisfactory to Trustee;

4.     counterpart signature pages to this Agreement and each of the Other Documents duly executed and acknowledged by Trustee

5.     an assignment by Trustee, in substantially the form annexed hereto as **Exhibit F** (the "Assignment and Assumption Agreement"), of all of Debtor's right, title and interest in, to and under:

   a)     the Warranties;

   b)     the Permits; and

   c)     any other of the Purchased Assets, the nature of which requires an assignment to be effectively transferred to Purchaser, including without limitation, the intangible property of Debtor;

6.     copies of all guaranties or warranties then in effect, if any, with respect to the Improvements and the Personal Property to the extent assignable (the "Warranties");

7.     copies of all licenses, permits, certificates of occupancy and accreditations issued by any federal, state, commonwealth, municipal or local governmental authority relating to the occupancy or ownership of the Land and Improvements, including the Facility running to, or in favor of, Debtor, to the extent legally assignable (including all modifications thereto or renewals thereof) (the "Permits")

8.     a complete set of keys for the Facility and Improvements;

9.     the Foreign Investment in Real Property Tax Act affidavit in substantially the form annexed hereto as **Exhibit G**;

10.     a form 1099 identifying Debtor's gross proceeds and Debtor's tax identification number, as required by the Title Company;

11. certificates, in form and substance reasonably acceptable to Purchaser, of the Trustee to the effect that the representations and warranties of Debtor set forth in this Agreement are true and complete on and as of the Closing Date, and that Debtor/Trustee have fulfilled the conditions of the Closing specified in the Agreement;

12. certificates of the Trustee, dated on or prior to the Closing Date, to the effect that (A) Debtor has been duly incorporated and is validly existing in good standing under the laws of the Commonwealth of Pennsylvania, and is authorized to do business in the commonwealth in which the Property is located, (B) Debtor has all requisite power and authority to perform the terms of this Agreement, (C) this Agreement (and all documents to be executed and delivered pursuant hereto (the "Other Documents")) have been duly authorized, executed and delivered by Trustee pursuant to all necessary resolutions or consents of the appropriate governing body of Debtor, (D) appearing on said certificate are the true signatures of all persons who have executed this Agreement and the Other Documents on behalf of Debtor and (E) the Trustee is fully authorized to act on behalf of Debtor or its shareholders, members or directors, as applicable.

13. such other customary closing documents required in Allegheny County, Pennsylvania, including any real estate transfer tax forms.

iv. Purchaser shall be satisfied that it will not have any obligations with respect to Debtor's outstanding Pennsylvania Nursing Facility Assessment by Pennsylvania Department of Human Services ("PDHS").

v. Between the date of this Agreement and the Closing Date, there shall not have been any material adverse change in the regulatory status and/or condition of any of Debtor's licenses, permits and/or certifications or the Medicare and Medicaid rates of the Facility.

vi. As of and on the Closing Date, Debtor is not subject to a Centers for Medicare & Medicaid Services ("CMS") survey tag of "G" or above, or has not received notice that it is not in substantial compliance with any state or federal regulations, rule or law with respect to survey tag with a scope or severity of "G" or above; provided, however, that if this condition precedent is not satisfied as of the Closing Date, Trustee shall have up to sixty (60) days to cure and Purchaser will proceed to Closing promptly upon such cure.

vii. Purchaser shall have been the successful bidder at the Auction.

viii. The Sale Approval Order shall have been entered by the Bankruptcy Court and shall have not been stayed, be subject to any pending appeal, request for leave to appeal or request for reconsideration and as to which the time for any such appeal, request for leave to appeal or request for reconsideration has expired (a "Final Order"), unless Purchaser, in its sole discretion, waives the requirement that the Sale Approval Order be a Final Order.

ix.    The representations and warranties of Trustee and Debtor contained in this Agreement shall be true and complete as of the Closing Date.

x.    Trustee and Debtor shall otherwise be in compliance with all terms, conditions, covenants and provisions of this Agreement.

b.    <u>Trustee's and Debtor's Conditions</u>.    Trustee's and Debtor's obligations to consummate the transactions contemplated in this Agreement and deliver title to the Property shall be subject to the following conditions precedent on and as of the Closing Date to the reasonable satisfaction of Trustee or the waiver thereof by Trustee, which waiver shall be binding upon Debtor and Trustee only to the extent made in writing and dated as of the Closing Date.

i.    Purchaser shall deliver the balance of the Purchase Price, subject to proration as provided herein, to Trustee.

ii.    Purchaser shall deliver the following:

1.    certificates of a duly authorized officer of Purchaser or of its managing constituent, dated the Closing Date, to the effect that (A) Purchaser has been duly organized and is validly existing in good standing under the laws of the Commonwealth of Pennsylvania and is authorized to do business in the Commonwealth of Pennsylvania, (B) Purchaser has all requisite power and authority to perform the terms of this Agreement, (C) this Agreement and the Other Documents have been duly authorized, executed, and delivered by Purchaser pursuant to all necessary resolutions or consents of the appropriate governing body of Purchaser, true and complete copies of which shall be attached to said certificate, and said consents remain in full force and effect, (D) appearing on said certificate are the true signatures of all persons who have executed this Agreement and the Other Documents on behalf of Purchaser and (E) the executing persons are fully authorized to act on behalf of Purchaser or its constituent partners or members, as applicable;

2.    a certificate of a duly authorized officer of Purchaser to the effect that the warranties and representations of Purchaser set forth in this Agreement are true and complete on and as of the Closing Date and that Purchaser has fulfilled the conditions of the Closing specified in the Agreement and attaching and certified copies of Purchaser's Certificate of Organization, Partnership Agreement, Resolutions; counterpart signature pages to this Agreement and each of the Other Documents as applicable, duly executed and acknowledged by Purchaser, as and to the extent herein provided;

iii.    Purchaser shall have been the successful bidder at the Auction.

iv.    The Final Order shall have been entered by the Bankruptcy Court unless Purchaser, in its sole discretion, waives the requirement that the Sale Approval Order be a Final Order.

v.    The representations and warranties of Purchaser contained in this Agreement shall be true and complete as of the Closing Date; and

vi.    Purchaser shall otherwise be in compliance with all terms, conditions, covenants and provisions of this Agreement.

c.    <u>Employment Matters.</u>  Purchaser shall determine, in its sole discretion, which of the Current Employees shall be offered employment with Purchaser, pursuant to employment terms acceptable to Purchaser; provided, however, that Purchaser acknowledges and agrees that it will hire substantially all of the Current Employees.  In contemplation of Purchaser offering employment to substantially all of the Current Employees, Trustee shall terminate their employment effective as of the Closing Date, a schedule of which is attached hereto as **Schedule 5(c)**.  Nothing in this paragraph, however, shall create any right in favor of any person not a party hereto, including without limitation, the Current Employees, or constitute an employment agreement or condition of employment for any Current Employee.  Neither Debtor nor the Facility is not party to any collective bargaining agreement with any labor union or similar organization, nor does Debtor or the Trustee know of any such organization which represents or claims to represent any of the employees of the Facility or intends to organize any of the employees of the Facility.

Should either party terminate the Agreement for any reason, the parties agree that neither shall, directly or indirectly, for themselves or on behalf of any other person, partnership, corporation or other business entity, solicit or attempt to solicit any employee or independent contractor of the other party for the purpose of enticing such individual to leave the employ or contractor status with the other party, to refrain from dealing with the other party, or to otherwise reduce the amount or type of business it does with the other party, for a period of one (1) year from the Effective Date of this Agreement.  Notwithstanding the sentence above, nothing herein shall limit a party from advertising or posting general solicitations seeking employees or independent contractors by means of general publication or distribution channels.

d.    <u>Conditions Generally</u>.  The foregoing conditions are for the benefit only of the party for whom it is specified to be conditions precedent and such party may, in its sole discretion, waive any or all of such conditions and proceed with the Closing under this Agreement without any increase in, abatement of or credit against the Purchase Price, provided that such waiver is in writing and duly executed by such party.  Notwithstanding anything to the contrary set forth in this Agreement, if Purchaser and Trustee close the transaction contemplated herein despite any conditions precedent remaining unsatisfied, then Purchaser, Debtor and/or Trustee, as applicable, shall be deemed to have waived any right to object to the Closing with respect to such unsatisfied conditions precedent, and no additional written document to such effect shall be required.

6.    **Apportionments; Post-Closing**.

a.    Closing <u>Prorations</u>.  All items of income and expense relating to periods both before and after the Closing Date shall be apportioned at the Closing.  In connection with the foregoing, the parties hereto agree to make the following apportionments:

i.        Real estate taxes, assessments, personal property taxes, and water, vault and sewer charges and rents, as well as any other governmental charges or taxes assessed on the Property or the other Purchased Assets, based on the rates and assessed valuation applicable in the fiscal year for which assessed;  Trustee and Purchaser agree to re-prorate taxes upon Purchaser's receipt of the actual tax bill for the tax year in question if the actual bills differ from the bills upon which the prorations are based as a result of a tax complaint, revaluation or otherwise.   This obligation to re-prorate shall survive the Closing. Allocation of real estate taxes billed with respect to the Property to yearly periods shall be determined in accordance with local custom, as determined by the Title Company.

ii.        All charges and payments for utility services; provided that if there is no meter or if the current bill for any of such utilities has not been issued prior to the Closing Date, then such charges shall be adjusted at the Closing on the basis of the charges for the prior period for which bills were issued and shall be further adjusted when the bills for the current period are issued; provided further, to the extent possible, Trustee shall terminate Debtor's accounts with the utility service providers and Purchaser shall establish its accounts with such utility service providers effective on the Closing Date, in which event, there shall be no proration for such utility services.

iii.        Subject to, and to the extent permitted by, applicable bankruptcy law and/or the Sale Order, all amounts allocable to periods prior to the Closing pursuant to this Section 6(a) shall be paid and discharged by Trustee at or prior to the Closing

iv.        Notwithstanding anything in this Section 6(a) or this Agreement to the contrary, this Section 6(a) shall not obligate Trustee to pay or discharge any assessments, charges, obligations, claims and/or debts asserted by, or owed to, PDHS or Pennsylvania Department of Health, or similar Governmental Authority, including those claims asserted by PDHS and filed at Proof of Claim No. 27-1 in the Bankruptcy Case.

b.        Insurance Policies.  Unless otherwise agreed, no insurance policies of Debtor are to be transferred to Purchaser, and no apportionment of the premiums therefor shall be made, in which event, Purchaser shall be responsible for securing its own insurance for the Property.

c.        Survival.  The obligations of the parties hereto under this Section 6 shall survive the Closing.

7.        **Interim Operations**.  From the Effective Date until the Closing, Trustee shall operate Debtor materially consistent with past operations or if unable, shall notify the Purchaser of such operational deviation

8.        **Debtor's Representations and Warranties**.  On behalf of Trustee and Debtor, as the case may be, Trustee hereby makes the following representations and warranties to Purchaser, which are made as of the date hereof, and shall be deemed remade as of the Closing Date:

a.        Organization and Authority.  Trustee is the duly appointed trustee of the Estate of Debtor.  Debtor is a Pennsylvania business corporation that validly exists under the laws of the

Commonwealth of Pennsylvania and is duly qualified to do business in the Commonwealth in which the Property is located. To the best of Trustee's knowledge, copies of Debtor's Articles of Incorporation, and any amendments thereof to date, which have been or are to be delivered to Purchaser, are complete and correct as of the date of this Agreement. Subject to approval of the Bankruptcy Court, Debtor and Trustee have full power and right to enter into and perform the respective obligations under this Agreement and the Other Documents, including, without being limited to, conveying the Property and the other Purchased Assets. Subject to the approval of this Agreement by the Bankruptcy Court, the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby (i) have been duly authorized by all necessary action on the part of Debtor, and (ii) will not result in the breach of any agreement, indenture or other instrument to which Debtor is a party or is otherwise bound. This Agreement and each other agreement contemplated hereby to which Debtor is a party constitutes its valid and legally binding obligation, enforceable in accordance with its terms, except as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

b.    <u>Non-Foreign Status</u>. Debtor is a "non-foreign person" within the meaning of Section 1445 of the United States Internal Revenue Code of 1986, as amended, and the regulations issued thereunder.

c.    <u>Special Assessments</u>. To the best of Trustee's knowledge, there are no (i) pending or threatened special assessments affecting the Property, (ii) contemplated improvements affecting the Property that may result in special assessments affecting the Property, (iii) tax abatements, phase-ins or exemptions affecting the Property.

d.    <u>Leases</u>. Except as provided on **Schedule 8(f)**, to the best of Trustee's knowledge, there are not currently, and as of the Closing Date there shall not be, any occupancy rights (written or oral), leases or tenancies presently affecting the Facility and the portion of the Land on which it is located, other than any occupancy rights of any residents of the Facility.

(b)    <u>Patient Trust Funds</u>. Neither the Debtor or the Trustee is holding any patient trust funds for the residents of the Facility and is not transferring any funds to Purchaser in trust on behalf of the residents.

e.    <u>Brokers</u>. Trustee has not dealt with any broker or finder which is entitled to a real estate commission as a result of this transaction.

f.    <u>Debtor's Knowledge</u>. Whenever a representation or warranty is made in this Agreement on the basis of Trustee's knowledge or to the best of Trustee's knowledge (or similar words), such representation or warranty based on Trustee's actual knowledge and in no way or manner requires Trustee to conduct any investigation of the existence of such fact or other matter.

9.    **Purchaser's Representations and Warranties**. Purchaser hereby makes the representations and warranties contained in this Section to Trustee and Debtor. These representations and warranties are made as of the date hereof and shall be deemed remade as of the Closing Date.

a.    <u>Organization and Authority</u>.  Purchaser is a limited partnership that has been duly organized and validly exists under the laws of the Commonwealth of Pennsylvania and is duly qualified to do business in the commonwealth in which the Property is located.  Purchaser has full power and right to enter into and perform its obligations under this Agreement and the Other Documents.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby (i) have been duly authorized by all necessary action on the part of Purchaser, (ii) do not require any governmental or other consent (except as otherwise provided herein), and (iii) will not result in the breach of any agreement, indenture or other instrument to which Purchaser is a party or is otherwise bound.  This Agreement and each other agreement contemplated hereby to which Purchaser is a party constitutes its valid and legally binding obligation, enforceable in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally or (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

b.    <u>Truth and Accuracy of Representations and Warranties</u>.  No representation_or warranty by or on behalf of Purchaser contained in this Agreement and no statement by or on behalf of Purchaser in any certificate, list, exhibit or other instrument furnished or to be furnished to Debtor and/or Trustee by or on behalf of Purchaser pursuant hereto contains any untrue statement of fact, or omits or will omit to state any facts which are necessary in order to make the statements contained therein, in light of the circumstances under which they are made, not misleading in any respect.

c.    <u>Brokers</u>.  Purchaser has not dealt with any broker or finder which is entitled to a real estate commission.

10.    **AS IS, WHERE IS**.  PURCHASER AGREES THAT PURCHASER IS PURCHASING THE PURCHASED ASSETS ON AN "AS IS, WHERE IS" BASIS AND, EXCEPT AS SPECIFICALLY SET FORTH HEREIN, WITH NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, EITHER ORAL OR WRITTEN, MADE BY TRUSTEE OR DEBTOR OR ANY AGENT OR REPRESENTATIVE OF TRUSTEE OR DEBTOR REGARDING THE CONDITION OF THE PURHASED ASSETS, INCLUDING BUT NOT LIMITED TO,  THE PHYSICAL OR STRUCTURAL CONDITION OF THE PURCHASED ASSETS, THE USE OF OR THE ZONING FOR THE PROPERTY, OR WITH RESPECT TO THE EXISTENCE OR ABSENCE OF TOXIC OR HAZARDOUS MATERIALS, SUBSTANCES OR WASTES IN, ON, UNDER OR AFFECTING THE PROPERTY.  TRUSTEE AND DEBTOR HAVE MADE AND HEREBY MAKE NO WARRANTY OR REPRESENTATION WHATSOEVER REGARDING THE FITNESS FOR PARTICULAR PURPOSE, QUALITY OR MERCHANTABILITY OF THE PURCHASED ASSETS.  TRUSTEE AND DEBTOR ARE NOT LIABLE OR BOUND IN ANY MANNER BY ANY WARRANTIES, EITHER EXPRESSED OR IMPLIED, GUARANTEES, PROMISES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE PURCHASED ASSETS MADE OR FURNISHED BY ANY REAL ESTATE AGENT, BROKER, EMPLOYEE, SERVANT OR OTHER PERSON REPRESENTING OR PURPORTING TO REPRESENT TRUSTEE OR DEBTOR. **This provision shall not merge with the Deed, but shall survive the Closing indefinitely.**

PURCHASER ACKNOWLEDGES THAT HAVING BEEN GIVEN A SUFFICIENT OPPORTUNITY TO INSPECT THE PURCHASED ASSETS, AND TO REVIEW OTHER MATERIAL GIVEN TO PURCHASER, PURCHASER IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PURCHASED ASSETS. TRUSTEE AND DEBTOR HEREBY SPECIFICALLY DISCLAIM ANY WARRANTY, GUARANTY, OR REPRESENTATION, ORAL OR WRITTEN, PAST, PRESENT, OR FUTURE OF, EXPRESSED OR IMPLIED, AS TO, OR CONCERNING THE NATURE AND CONDITION OF THE PROPERTY AND PURCHASED ASSETS, INCLUDING, WITHOUT LIMITATION, THE WATER, SUB-SURFACE, SOIL, AND GEOLOGY OF THE SAME, AND THE SUITABILITY THEREOF AND OF THE PROPERTY AND PURCHASED ASSETS FOR ANY AND ALL ACTIVITIES AND USES WHICH PURCHASER MAY ELECT TO CONDUCT THEREON. **This provision shall not merge with the Deed, but shall survive the Closing indefinitely.**

11.    **Risk of Loss**.

a.    _Fire or Other Casualty_.  Trustee shall give Purchaser written notice of any fire or other casualty causing material damage to the Purchased Assets within three (3) days of the occurrence of same (but in any event prior to the Closing).  Such notice shall include a description thereof in reasonable detail and an estimate of the cost of and time to repair.  Unless the Trustee elects to repair the damage or replace the Purchased Asset within a reasonable period (but in any event prior to the Closing), Purchaser, within ten (10) days after notice thereof, by written notice to Trustee, shall have the option to cancel this Agreement.  For the purposes of this Section10, "material" damage or destruction shall include any damage or destruction that would require more than Twenty Thousand Dollars ($20,000) to repair.  If Purchaser so elects to cancel this Agreement, Purchaser shall be refunded the Deposit and this Agreement shall terminate and be of no further force and effect and neither party shall have any liability to the other hereunder. If Purchaser shall not so elect to cancel this Agreement, then the sale of the Property shall be consummated at the Purchase Price provided for herein (without abatement) and Trustee shall assign to Purchaser at the Closing all of Debtor's right, title and interest in and to all insurance proceeds due to Debtor for the fire or other casualty to the extent of the Purchase Price.

b.    _Eminent Domain_.  The risk of any loss or damage to the Property by condemnation before the Closing Date hereunder is assumed by Debtor.  In the event any condemnation proceeding is commenced or threatened, Trustee shall give Purchaser written notice thereof within three (3) days after the occurrence of same (but in any event prior to the Closing), together with such reasonable details with respect thereto as to which Trustee may have knowledge.  As soon as the portion or portions of the Property to be taken are reasonably determinable, Trustee shall give Purchaser written notice thereof together with Trustee's estimate of the value of the portion or portions of the Property to be so taken.  In the event of any material taking of the Property, Purchaser, by written notice to Trustee within ten (10) days after notice thereof, shall have the option to cancel this Agreement, in which event Purchaser shall be refunded the Deposit and this Agreement shall terminate and be of no further force and effect and neither party shall have any liability to the other hereunder except for those which expressly survive the Closing.  For the purposes of this Section 11, a "material" taking shall include: (i) any taking (A) the effect of which would be to require more than Twenty Thousand Dollars ($20,000) to repair the balance of the Property or (B) materially impair the use or operation of the Purchased Assets; or (ii) any threat of

a taking or any reasonably equivalent indication on the part of a condemning authority of such intention where there is no reasonable basis to conclude that the actual taking would not be material.  If Purchaser shall not so elect to cancel this Agreement, then the sale of the Property shall be consummated at the Purchase Price provided for herein (without abatement) and Trustee shall assign to Purchaser at the Closing all of Debtor's right, title and interest in and to all awards made in respect of such condemnation and any claims in respect of any rent insurance or equivalent coverage maintained by it with respect to periods after the Closing.  Purchaser shall be entitled to participate in any such condemnation proceeding, and Trustee shall cooperate with Purchaser in such respect.

c.   <u>Survival</u>.  The parties' obligations, if any, under this <u>Section 10</u> shall not survive the Closing.

12.   **Remedies.**

a.   <u>Trustee's/Debtor's Default</u>.  If (i) prior to the Closing, Debtor/Trustee shall default under any covenant, obligation or materially breach any representation or warranty set forth herein (which default is not waived in writing by Purchaser) or any closing condition shall not be met, or (ii) Debtor shall fail to deliver title to the Property as required hereunder, fail to satisfy any of the closing conditions set forth in <u>Section 5(a)</u> hereof (and such failure is not waived in writing by Purchaser) or otherwise fail to consummate the transactions contemplated herein, then Purchaser may elect to: (i) terminate this Agreement by written notice to Trustee, in which event  the Title Company shall refund the Deposit to Purchaser; and/or (ii) specifically enforce this Agreement; provided, however, unless otherwise provided in this Agreement, nothing in this <u>Section 12(a)</u> shall prevent Purchaser from making a claim for direct damages after the Closing Date for a breach of any representation, warranty, term, provision, condition or covenant hereunder.

b.   <u>Purchaser's Default</u>.  If (i) prior to the Closing, Purchaser shall default under any covenant, obligation or closing condition or materially breach any representation or warranty set forth herein (which default is not waived in writing by Trustee), or (ii) Purchaser shall fail to deliver the Purchase Price as required hereunder, fail to satisfy any of the closing conditions set forth in Section 5(b) hereof (and such failure is not waived in writing by Trustee) or otherwise fail to consummate the transactions contemplated herein, then Trustee shall have the right to declare this Agreement terminated by written notice to Purchaser, in which case the Deposit shall be forwarded to Trustee by the Title Company as liquidated damages and as Trustee's sole remedy hereunder (it being agreed by the parties that Trustee's and Debtor's estate damages for negotiating and entering into this Agreement are difficult to determine, and that the amount of the Deposit represents a fair and reasonable estimate of those damages); provided, however, unless otherwise provided in this Agreement, nothing in this <u>Section 12(b)</u> shall prevent the Debtor or Trustee from making a claim for direct damages after the Closing Date for a breach of any representation, warranty, term, provision, condition or covenant hereunder.

13.   **Medicare; Post-Closing Receipt by Debtor of Purchaser's Receivables**.  Trustee shall remit to Purchaser any payments received by Debtor arising out of the post-closing operation of the Facility within ten (10) days of the receipt of the payment.  Effective on the Closing Date, Debtor sells, assigns and conveys to Purchaser the Medicare provider number in use at the Facility (the "<u>Existing Medicare Provider Number</u>").  Notwithstanding the foregoing, the Debtor retains

any and all rights and liabilities relating to the Existing Medicare Provider Number relating to any
and all periods preceding the Closing Date.  Debtor and Trustee and Purchaser shall execute any
and all documents necessary and will otherwise cooperate in connection with the assignment of
the Existing Medicare Provider Number. During the pendency of Purchaser's CMS Form 855A,
Purchaser may bill Medicare under Debtor's name and the Existing Medicare Provider Number,
until the Intermediary changes the electronic funds transfer account or special payment address to
the Purchaser.  Notwithstanding the foregoing, Purchaser shall be responsible for all rights and
liabilities relating to the Existing Medicare Provider Number relating to any and all periods on or
after the Closing Date.  This Section 13 is intended to satisfy the requirements of Chapter Section
15.7.7.1.5 of the Medicare Program Integrity Manual.

14.    **Notices**.  All notices, demands or other communications given hereunder shall be
in writing and shall be deemed to have been duly delivered (a) upon the delivery (or refusal to
accept delivery) by messenger or overnight express delivery service (or, if such date is not on a
business day, on the business day next following such date), or (b) on the third $(3^{rd})$ business day
next following the date of its mailing by certified mail, postage prepaid, at a post office maintained
by the United States Postal Service, or (c) upon the receipt by facsimile or email transmission as
evidenced by a receipt transmission report (followed by delivery by one of the other means
identified in (a)-(b)), addressed as follows:

| | |
|---|---|
| if to Debtor: | William G. Krieger, Chapter 11 Trustee |
| | Gleason & Associates P.C. |
| | One Gateway Center, Suite 525 |
| | 420 Fort Duquesne Boulevard |
| | Pittsburgh, PA  15222-1402 |
| | Facsimile: 412-391-1192 |
| | Email:  wkrieger@gleasonexperts.com |
| | |
| with a copy to: | John M. Steiner, Esquire |
| | Leech Tishman Fuscaldo & Lampl, LLC |
| | 525 William Penn Place, 28th Floor |
| | Pittsburgh, PA 15219 |
| | Facsimile: 412.227.5551 |
| | Email: jsteiner@leechtishman.com |
| | |
| if to Purchaser: | |
| with a copy to: | Gutnicki LLP |
| | 4711 Golf Road, Suite 200 |
| | Skokie, Illinois 60076 |
| | Attn:  Abraham A. Gutnicki, Stacy J. Flanigan |
| | Facsimile: (847) 933-9285 |
| | E-mail:agutnicki@gutnicki.com, |
| | sflanigan@gutnicki.com |

Either party may, by notice given as aforesaid, change the address or addresses, or designate an additional address or additional addresses, for its notices, provided, however, that no notice of a change of address shall be effective until actual receipt of such notice.

15.  **Closing Costs**.  Debtor shall bear the cost to record any instrument to clear Debtor's title to the extent Debtor is required to do so pursuant to this Agreement.   Debtor shall pay all costs and fees customarily paid by sellers in a real estate sale transaction in the city of Jefferson Hills, Pennsylvania.  Purchaser shall pay all other costs and fees customarily paid by purchasers in a real estate sale transaction in the city of Jefferson Hills, Pennsylvania.  Each of Debtor and on one side and Purchaser on the other agree to pay its own attorneys' fees incurred in connection with the negotiation, preparation and consummation of the transactions contemplated hereby.

16.  **Transfer Taxes**.  If applicable, in accordance with Section 1146 of the Bankruptcy Code, the making or delivery of any instrument of transfer, including the filing of any deed or other document of transfer to evidence, effectuate or perfect the rights, transfers and interest contemplated by this Agreement, shall be pursuant to and in contemplation of a plan or plans of reorganization to be confirmed in Debtor's bankruptcy case, and as such shall be free and clear of any and all transfer taxes, stamp taxes, or similar taxes.  The instruments transferring the Purchased Assets to Purchaser shall contain the following endorsement:

"Because this [instrument] has been authorized pursuant to Order of the United States Bankruptcy Court for the Western District of Pennsylvania, relating to a plan of reorganization of the Grantor, it is exempt from transfer taxes, stamp taxes or similar taxes pursuant to 11 U.S.C. § 1146(c), and is further exempt pursuant to § 1102-C.3(2) of the Pennsylvania Tax Reform Code of 1971, as amended, 72 P.S. § 1102-C.3(2) as a document which the Commonwealth and the City are prohibited from taxing under the Constitution and statutes of the United States."

In the event a plan is not filed and/or confirmed by the Bankruptcy Court and real estate transfer taxes are required to be paid in order to record the deeds to be delivered to Purchaser in accordance herewith, such real estate transfer taxes incurred as a result of the transactions contemplated hereby shall be paid one-half by Debtor and one-half by Purchaser.  In the event sales, use or other transfer taxes are assessed at the Closing or at any time thereafter on the transfer of any other Purchased Assets, such taxes incurred as a result of the transactions contemplated hereby shall be paid by Purchaser.

17.  **Choice of Law**.  THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS SHALL BE GOVERNED AND CONTROLLED BY THE INTERNAL LAWS OF THE COMMONWEALTH OF PENNSYLVANIA AS TO INTERPRETATION, ENFORCEMENT, VALIDITY, CONSTRUCTION, EFFECT, AND IN ALL OTHER RESPECTS.

18.  **Miscellaneous**.

a.  Entire Agreement.  This Agreement, together with all exhibits and schedules attached hereto and any other agreements referred to herein, constitutes the entire understanding between the parties with respect to the subject matter hereof, superseding all negotiations, prior discussions and preliminary agreements.

b.      Exhibits and Schedules. If any exhibits or schedules are not completed or attached hereto as of the date of this Agreement, the parties hereto agree to attach such exhibits and schedules within seven (7) days of the date of the Bidding Procedures Order, unless stated otherwise herein, but in any event, this Agreement is subject to Purchaser approving all exhibits and schedules or subsequent updates thereto within seven (7) days of submission thereof to Purchaser. The parties hereto agree that the party charged with providing an exhibit or schedule to this Agreement shall, to the extent necessary after delivery thereof, amend or supplement all exhibits and schedules in order for the same to be current, true and correct as of the Closing Date.

c.      Modification/Amendment. This Agreement may not be modified or amended except in writing signed by the parties hereto and approved by the Bankruptcy Court.

d.      Waiver. No waiver of any term, provision or condition of this Agreement, shall be deemed to be or be construed as a further or continuing waiver of any such term, provision or condition of this Agreement. No failure to act shall be construed as a waiver of any term, provision, condition or rights granted hereunder.

e.      Jurisdiction; Venue. ANY ACTION WITH RESPECT TO A DISPUTE REGARDING THIS AGREEMENT, THE SALE APPROVAL ORDER, OR THE ENFORCEMENT OR THE INTERPRETATION THEREOF, SHALL BE BROUGHT IN THE JURISDICTION OF THE BANKRUPTCY COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA. TO THE EXTENT LEGALLY WAIVABLE, EACH OF THE PARTIES HERETO HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON SUCH PARTIES BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO SUCH PARTY, AT THE ADDRESS SET FORTH FOR NOTICE IN THIS AGREEMENT AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED. THE PARTIES HERETO HEREBY WAIVE ANY RIGHT THEY MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST SUCH PARTY IN ACCORDANCE WITH THIS SECTION.

f.      Headings. The headings of the various Sections of this Agreement have been inserted only for the purposes of convenience, are not part of this Agreement and shall not be deemed in any manner to modify, explain, qualify or restrict any of the provisions of this Agreement.

g.      Counterparts. This Agreement may be executed in any number of counterparts, each of which shall for all purposes be deemed an original, but all such counterparts shall together constitute one and the same agreement. Signatures sent by telecopy or electronic mail transmissions shall constitute originals.

h.      Successors and Assigns. This Agreement shall bind and inure to the benefit of the respective heirs, executors, administrators, personal representatives, successors and permitted assigns of the parties hereto; provided, however, that neither party hereto shall assign this Agreement without the prior written consent of the other party, which consent shall not be unreasonably withheld. Notwithstanding the foregoing, however, Purchaser may assign its rights

under this Agreement to an affiliated entity or entities; provided, however, such assignment shall not relieve Purchaser for any of its obligations under this Agreement and Purchaser hereby acknowledges and agrees that notwithstanding any assignment it shall remain liable for all obligations under this Agreement. Any assignment not permitted hereunder and undertaken without such prior written consent shall be deemed null and void. Trustee acknowledges that Purchaser will be assigning all provisions relating to operations of the Facility to [_____], who will be the operator upon Closing.

   i. Further Assurances. Each of Trustee and Purchaser shall provide to the other such further assurances as may reasonably be required hereunder to effectuate the purposes of this Agreement and, without limiting the foregoing, shall execute and deliver such affidavits, certificates and other instruments as may be so required hereunder so long as the same shall not materially increase the liability of the party so executing and delivering said instrument.

   j. Severability. If any term or provision of this Agreement shall to any extent be held invalid or unenforceable, the remaining terms and provisions of this Agreement shall not be affected thereby, but, each term and provision shall be valid and be enforced to the fullest extent permitted by law.

   k. Usage. All nouns and pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons, firm or firms, corporation or corporations, entity or entities or any other thing or things may require, or "any" shall mean "any and all"; "or" shall mean "and/or" and "including" shall mean "including without limitation.

   l. No Strict Construction. The language used in this Agreement is the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any of the parties hereto.

   m. Survival. This Agreement shall survive the Closing and shall not merge with the Deed. All representations and warranties of the parties and all covenants, agreements, undertakings and indemnities set forth in this Agreement shall survive until the closing of the Bankruptcy Case.

*[Remainder of this page left intentionally blank. Signature page follows.]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be signed as of the day and year first above written.

## DEBTOR

Lawson Nursing Home, Inc.

By: _____

Name: William G. Krieger

Title:   Chapter 11 Trustee

## PURCHASER

Jefferson Hills Holdings, LLC

By: _____

Name: Shlomo Mushell

Title:   Authorized Signatory

## EXHIBIT A

## LEGAL DESCRIPTION OF LAND

All that certain tract of ground situate in the Borough of Jefferson Hills, County of Allegheny and Commonwealth of Pennsylvania, bounded and described as follows:

Beginning at a point on the center line of the paving of the Coal Valley Road at the easterly line of the land of the Valley Elementary School, formerly of W. L. McKee; thence along the center line of the paving of the Coal Valley Road, North 34° 33' East, 59.71 feet to a point of curve; thence continuing along the center line of the paving of the Coal Valley Road by the arc of a circle curving to the right having a radius of 100 feet, an arc distance of 148.6 feet, more or less, to the line of land conveyed to Thomas W. Harvey and Kenneth E. Barr by deed dated July 21, 1948 and recorded in Deed Book Volume 3005, page 581; thence along the line of land conveyed to Harvey and Barr, North 35° 26' East, 448.14 feet to a point; thence along other lands of Susanna Merritt, North 43° 13' West, 726.68 feet to a point; continuing along the same, North 0° 06' East, 115.81 feet to the line of land conveyed to Grace S. Cochran by deed dated March 8, 1953 and recorded in Deed Book Volume 3266, page 251; thence along the said land conveyed to Grace S. Cochran, South 72° 17' West, 300.08 feet to the line of land of the Valley Elementary School, formerly of Dryer; thence along the said line of land of the Valley Elementary School, South 19° 44' East, 1060.4 feet to the place of beginning.

Being Tax Parcel Block 560-E, Lot 150.

Being the same property which Richard E. Lawson and Agnes H. Lawson, husband and wife, conveyed to Beatrice Lawson Nursing Home, Inc., a Pennsylvania corporation, by deed dated December 26, 1962 and recorded in Deed Book Volume 4005, page 744.

Beatrice Lawson Nursing Home, Inc. changed its name to Lawson Nursing Home, Inc. by amendment to its corporate charter filed with the Pennsylvania Department of State on August 30, 1982.

## EXHIBIT B

## ALLOCATION OF PURCHASE PRICE

Land:                    $[*]

Building:                $[*]

Personal Property:       $[*]

Goodwill:                $[*]

## EXHIBIT C

## DUE DILIGENCE MATERIALS

## EXHIBIT D

## FORM OF DEED

## EXHIBIT E

## FORM OF BILL OF SALE

### BILL OF SALE

[_____], a [_____] ("Debtor"), in consideration of _____ Dollars ($)_____), receipt of which is hereby acknowledged, does hereby sell, assign, transfer and set over to [ _ ], ("Purchaser"), all of its right, title and interest in and to the following described personal property, to-wit:

All the "Personal Property", as defined in that certain Asset Purchase Agreement ("APA"), dated as of [*], by and among Debtor and Purchaser.

Debtor hereby represents and warrants to Purchaser that Debtor is the absolute owner of said property that said property is free and clear of all liens, charges and encumbrances, and that Debtor has full right, power and authority to sell said personal property and to make this Bill of Sale. Except as set forth in the APA, all warranties of quality, fitness and merchantability are hereby excluded.

**IN WITNESS WHEREOF**, Debtor has caused this Bill of Sale to be signed and sealed in its name by its officer thereunto duly authorized this ___ day of _____, 2019.

**DEBTOR**

Bankruptcy Estate of Lawson Nursing Home, Inc.


By:_____
Name: William G. Krieger
Title:   Chapter 11 Trustee

## EXHIBIT F

## FORM OF GENERAL ASSIGNMENT

### ASSIGNMENT

**THIS ASSIGNMENT** is made as of the ___ day of _____ 2019, by Lawson Nursing Home, Inc. by its Chapter 11 Trustee, William G. Krieger, ("Assignor"), to [ _ ], a _____ ("Assignee").

### W I T N E S S E T H:

**WHEREAS**, by Asset Purchase Agreement (the "APA"), dated _____, 2019, by and between Assignor and Assignee, Assignor agreed to sell to Assignee certain real property, improvements, fixtures, personal property and such other assets, as more fully described in the APA (the "Purchased Assets") (capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the APA); and

**WHEREAS**, the APA provides, inter alia, that Assignor shall assign to Assignee, Assignor's intangible property, the Warranties, the Permits and such other items applicable to the Purchased Assets, as more fully provided in the APA.

**NOW, THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby agrees as follows:

1.    **Transfer of Intangible Property**. Assignor hereby assigns, sets over and transfers to Assignee all of Assignor's right, title and interest in, to and under all intangible property, to the extent the same constitute Purchased Assets pursuant to the APA.

2.    **Transfer of Warranties**. Assignor hereby assigns, sets over and transfers to Assignee, all of Assignor's right, title and interest in, to and under the Warranties.

3.    **Transfer of Permits**. Assignor hereby assigns, sets over and transfers to Assignee, all of Assignor's right, title and interest in, to and under the Permits.

4.    **Other Assets**. Assignor hereby assigns, sets over and transfers to Assignee all of Assignor's right, title and interest in, to and under any of the other Purchased Assets, which transfer may be effectuated only through an instrument for such assignment.

5.    **Assumption**. Assignee hereby accepts the foregoing assignments set forth in Sections 1, 2, 3, and 4 hereof, provided, that said assignment and assumption shall in all respects be subject to the terms of the APA with regard to the rights and obligations of each of the parties

hereto with respect to the items assigned hereunder, and in the event that any term of this Assignment shall contradict the APA, the APA shall control.

      6.    **Miscellaneous**.  This Assignment and the obligations of Assignor and Assignee hereunder shall survive the closing of the transactions referred to in the APA shall be binding upon and inure to the benefit of Assignor and Assignee, and their respective successors and assigns, shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania and may not be modified or amended in any manner other than by a written agreement signed by the party to be charged therewith.

      **IN WITNESS WHEREOF**, Assignor has duly executed this Assignment as of the day and year first above written.

**ASSIGNOR**

Bankruptcy Estate of Lawson Nursing Home, Inc.

By:_____

Name: William G. Krieger

Title:   Chapter 11 Trustee

**ASSIGNEE**

[ _ ]

By:    _____

Name:

Its:

## EXHIBIT G

### FORM OF FIRPTA AFFIDAVIT

### FIRPTA AFFIDAVIT

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person.  To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by Lawson Nursing Home, Inc., (the "Debtor"), the undersigned hereby certifies on behalf of Debtor as follows:

1.     Debtor is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2.     Debtor is not a disregarded entity as defined in §1.1445-2(b) (2) (iii);

3.     Debtor's employer identification number is _____; and

4.     Debtor's office address is_____.

Debtor understands that this certification may be disclosed to the Internal Revenue Service by Purchaser and that any false statement made here could be punished by fine, imprisonment, or both.

Under penalties of perjury I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of Debtor.

Date:   _____

**DEBTOR**

Bankruptcy Estate of Lawson Nursing Home, Inc.

By:_____
Name: William G. Krieger
Title:   Chapter 11 Trustee

{1236/001/00358194.1}

Asset Purchase Agreement by and between, Lawson Nursing Home, Inc. and Jefferson Hills
Holdings, LLC dated August 1, 2019

Schedule 1(c)

List of Deposits, Prepaid Expenses, Claims for Refunds and Rights of Offset

[T/B/D]

Asset Purchase Agreement by and between, Lawson Nursing Home, Inc. and Jefferson Hills
Holdings, LLC dated August 1, 2019

Schedule 1(d)

List of Executory Contracts and/or Unexpired Leases

| Counterparty | Type | Date | Cure Amount |
|---|---|---|---|
| | | | |
| Accelerated Care Plus Leasing | Equipment Lease | April 17, 2013 | $4,875 |
| Dr. Nupur Dashottar | Medical Director Agreement | July 1, 2012 | $0.00 |
| Mission Pharmacy Services, LLC | Facility Agreement for Clinical Services | February 15, 2013 | $0.00 |
| Mission Pharmacy Services, LLC | Facility Agreement with Provider Pharmacy | February 15, 2013 | $0.00 |
| Trilogy Mission RX, LLC, d/b/a Pharmarcy Care Advocates a/k/a PCA Mission Pharmacy Services, LLC | Facility Agreement with Provider Pharmacy | February 15, 2013 | $321,896.95 |
| A/B Nursing Home Self-Insurance Group Trust Fund For Workers' Compensation | Workers' Compensation Agreement | April 23, 2009, as amended, October 22, 2009 | $21,819 |
| Wescom Solutions, Inc. | PointClickCare.com Subscription Service Agreement | September 1, 2019 | $7,171.23 |
| Rostraver West Newton E.S., Inc. | Emergency Services Agreement | July 11, 2019 | $0.00 |
| Ricoh USA, Inc. | Copier Lease | | $12,331.22 |
| Centers for Medicare & Medicaid Services | Part A Provider Agreement | | t/b/d |

Asset Purchase Agreement by and between, Lawson Nursing Home, Inc. and Jefferson Hills
Holdings, LLC dated August 1, 2019

Schedule 1(d)(i)

List of Executory Contracts and/or Unexpired Leases to be Assumed and Assigned

| Counterparty | Type | Date | Cure Amount |
|---|---|---|---|
| Centers for Medicare & Medicaid Services | Part A Provider Agreement | | t/b/d |

Asset Purchase Agreement by and between, Lawson Nursing Home, Inc. and Jefferson Hills
Holdings, LLC dated August 1, 2019

Schedule 5(c)

List of Employees to be Terminated by Chapter 11 Trustee

[T/B/D]

Asset Purchase Agreement by and between, Lawson Nursing Home, Inc. and Jefferson Hills
Holdings, LLC dated August 1, 2019

Schedule 8(f)

Leases

| Name | Type | Date |
|------|------|------|
|  |  |  |
| Helen Lumsden | Squatter/Complaint for Ejectment filed August 6, 2019; Amended Complaint Filed August 14, 2019 | N/A |